*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1531**

In the Matter of the Welfare of the Children of: M. J. W. and M. A., Parents.

**Filed February 29, 2016
Affirmed
Schellhas, Judge**

Itasca County District Court
File Nos. 31-JV-14-2237, 31-JV-15-308

Bill L. Thompson, Law Office of Bill L. Thompson, Duluth, Minnesota (for appellant M.J.W.)

John J. Muhar, Itasca County Attorney, Mary J. Evenhouse, Assistant County Attorney, Grand Rapids, Minnesota (for respondent Itasca County Health and Human Services)

Traci Kapella, Grand Rapids, Minnesota (guardian ad litem)

Considered and decided by Worke, Presiding Judge; Schellhas, Judge; and Johnson, Judge.

**U N P U B L I S H E D   O P I N I O N**

**SCHELLHAS**, Judge

Appellant challenges the termination of her parental rights, arguing that the district court abused its discretion by determining that statutory grounds for termination existed and that termination was in the children's best interests. We affirm.

**FACTS**

This case arises out of the termination of the parental rights of appellant M.J.W. (mother) to her minor children, J.C.W., born April 20, 2008, and G.E.W.A., born February 23, 2011.[1] On August 7, 2014, respondent Itasca County Health and Human Services (ICHHS) petitioned the district court to adjudicate the children as children in need of protection or services (CHIPS). The same day, the court ordered emergency out-of-home placement of the children. On August 28, mother signed out-of-home placement plans for both children and acknowledged that the plans were explained to her and that she received copies of the plans. On October 24, mother agreed to the court's CHIPS adjudication of the children. The court granted ICHHS interim custody of the children and approved the out-of-home placement plans (placement plans).

On February 4, 2015, ICHHS petitioned for termination of mother's parental rights (TPR) to J.C.W. and G.E.W.A., alleging that the children were neglected and in foster care and that reasonable efforts had failed to correct the conditions leading to the children's out-of-home placement because of mother's failure to comply with the placement plans. On March 25, ICHHS reported to the district court that mother was "presently engaging in services" and sought to withdraw the TPR petition. The district court received updated

[1] Mother has a long history of chemical dependency, dating back to when she was ten years old. She has attempted unsuccessfully to complete chemical-dependency treatment more than eight times and has untreated mental-health issues. Mother has six other children. Four of the children resided with their maternal grandmother but then moved in with their uncle and aunt. Another child resides with mother's former husband. Mother's brother and sister-in-law adopted the sixth child.

2

placement plans that mother signed on April 13. On April 20, the court dismissed the petition.

On June 11, 2015, ICHHS again petitioned for mother's TPR, alleging that the children were neglected and in foster care and that reasonable efforts had failed to correct the conditions leading to the children's out-of-home placement. The district court set a TPR trial for August 18 at 8:30 a.m. On the trial date, the court delayed the start of trial for almost two hours when mother did not appear. The court then allowed ICHHS to proceed by default on the TPR petition and terminated mother's parental rights to J.C.W. and G.E.W.A. on August 31.

This appeal follows.

**D E C I S I O N**

A district court may, upon petition, involuntarily terminate all rights of a parent to a child if at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the child's best interests. *See* Minn. Stat. §§ 260C.301, subds. 1(b) (providing for involuntary termination of parental rights on finding that one or more specified conditions exists), 7 (providing that "the best interests of the child must be the paramount consideration, provided that . . . at least one condition in subdivision 1, clause (b), [is] found by the court"), .317, subd. 1 ("If, after a hearing, the court finds by clear and convincing evidence that one or more of the conditions set out in section 260C.301 exist, it may terminate parental rights.") (2014); *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 137 (Minn. 2014) ("[The supreme court] ha[s] made clear that an involuntary termination of parental rights is proper only when at least one statutory ground

for termination is supported by clear and convincing evidence *and* the termination is in the child's best interest.").

> [Appellate courts] review the termination of parental rights to determine whether the district court's findings address the statutory criteria and whether the district court's findings are supported by substantial evidence and are not clearly erroneous. [Appellate courts] give considerable deference to the district court's decision to terminate parental rights. But [appellate courts] closely inquire into the sufficiency of the evidence to determine whether it was clear and convincing. [Appellate courts] affirm the district court's termination of parental rights when at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the best interests of the child, provided that the county has made reasonable efforts to reunite the family.

*In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008) (citations omitted); *see also In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901, 905 (Minn. App. 2011) (stating that "on appeal from a district court's decision to terminate parental rights, we will review the district court's findings of the underlying or basic facts for clear error, but we review its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion, and "[w]e review a district court's ultimate determination that termination is in a child's best interest for an abuse of discretion"), *review denied* (Minn. Jan. 17, 2012).

*Statutory grounds for termination*

Mother first challenges the district court's determination that J.C.W. and G.E.W.A. were neglected and in foster care. One of the statutory grounds for involuntary termination of parental rights is if "the child is neglected and in foster care." Minn. Stat. § 260C.301, subd. 1(b)(8).

4

"Neglected and in foster care" means a child:

> (1) who has been placed in foster care by court order; and
> (2) whose parents' circumstances, condition, or conduct are such that the child cannot be returned to them; and
> (3) whose parents, despite the availability of needed rehabilitative services, have failed to make reasonable efforts to adjust their circumstances, condition or conduct, or have willfully failed to meet reasonable expectations with regard to visiting the child or providing financial support for the child.

Minn. Stat. § 260C.007, subd. 24 (2014).

Mother does not dispute that the children have been placed in foster care by court order; she does dispute that ICHHS proved the balance of the definition of "[n]eglected and in foster care" found in subparagraphs (2) and (3). *Id.* But mother presents no argument or authority regarding whether her "circumstances, condition, or conduct are such that the child[ren] cannot be returned to [her]." *Id.*, subd. 24(2). The issue as to subparagraph (2) therefore is not properly before us. *See In re Welfare of Children of J.B.*, 698 N.W.2d 160, 166 (Minn. App. 2005) (declining to address argument for which father cited no authority).

As to subparagraph (3), mother asserts that one of the reports that ICHHS submitted to the district court recommended dialectical behavior therapy (DBT) to treat mother's borderline personality disorder and argues that, because ICHHS did not provide DBT to her as part of the placement plans, ICHHS failed to provide her necessary rehabilitative services. Mother argues that ICHHS therefore failed to prove by clear and convincing evidence that J.C.W. and G.E.W.A. were neglected and in need of foster care. Mother's arguments are unpersuasive.

5

At the August 18, 2015 default hearing, the district court received the out-of-home placement plans that mother signed on August 28, 2014. The plans required mother to "[c]ooperate with DBT if recommended." But mother's counselor did not recommend DBT, preferring that mother "focus on other issues." Moreover, one of the ICHHS social workers testified that although she attempted to engage mother in a parenting-capacity assessment in August 2014, mother did not begin to participate in a parenting-capacity assessment until May 2015, completing it in July. The psychologist who assessed mother recommended in a July 2015 report that mother engage in DBT "[d]ue to [her] exquisite inter- and intra-personal anxiety and distress and tendency to unfavorably compare those within her limited network." At the hearing, the court received the report, and the social worker acknowledged that mother had not received DBT. But mother's lack of DBT resulted from her own actions in delaying the parenting assessment—not from a failure by ICHHS to make DBT available to mother.

The August 2014 and April 2015 placement plans listed a variety of services for mother, including parenting education, counseling and therapy, mental-health assessment and services, chemical-health assessment and services, gas vouchers for transportation, domestic-violence services, medical assistance, and home-management services. The court heard the testimony of the social worker and the children's court-appointed guardian ad litem (GAL) for most of the proceedings and received their reports, as well as reports from mother's service providers. The testimony and reports show that mother frequently failed to comply with the placement plans, such as by failing to accept or meaningfully participate in the mental-health and chemical-dependency services that ICHHS provided to her, failing

to attend scheduled visits with the children, failing or refusing alcohol- and drug-screening tests, and failing to maintain regular contact with ICHHS.

We conclude that the record contains clear and convincing evidence that ICHHS made necessary rehabilitative services available to mother. *Cf. J.R.B.*, 805 N.W.2d at 903–04 (concluding that clear and convincing evidence supported district court's findings underlying its determination that children were neglected and in foster care where record showed that mother received psychological evaluation, and "counseling, aftercare, urinalysis, a rule 25 chemical dependency assessment, parenting classes and other services were available to mother"). The district court did not abuse its discretion by determining that J.C.W. and G.E.W.A. were neglected and in foster care.

Another statutory basis for involuntary termination of parental rights is if, "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." Minn. Stat. § 260C.301, subd. 1(b)(5). Mother also challenges the district court's determination that ICHHS made reasonable efforts to rehabilitate her and reunify her with the children, arguing that ICHHS did not make reasonable efforts because she never received DBT. Because we conclude that the district court did not abuse its discretion by determining that the children were neglected and in foster care, we do not address this second basis for termination. *See In re Children of T.A.A.*, 702 N.W.2d 703, 708 & n.3 (Minn. 2005) (stating that "[o]nly one ground must be proven for termination to be ordered" and that "because we conclude termination was appropriate based on palpable unfitness, we do not address the remaining grounds for termination cited by the district court").

*Best interests of children*

Mother challenges the district court's determination that TPR serves the children's best interests. "[T]he best interests of the child must be the paramount consideration, provided that . . . at least one condition [for involuntary termination is] found by the court." Minn. Stat. § 260C.301, subd. 7. "[T]ermination based solely on a statutory presumption is improper. The juvenile court also must independently find in each case, even with a presumption of unfitness, that termination is in the child's best interests." *R.D.L.*, 853 N.W.2d at 137. "[C]onflicts between the rights of the child and rights of the parents are resolved in favor of the child." *J.R.B.*, 805 N.W.2d at 902. "In analyzing a child's best interests, the court must balance three factors: (1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *Id.* at 905 (quotation omitted). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *Id.*

Here, the district court found:

> The Court believes [mother] has an interest in preserving the parent/child relationship, [mother] has vocalized this on numerous occasions. [Mother] has been unable or unwilling to utilize the services in order to obtain reunification. The children have reportedly communicated various interest in preserving the parent/child relationship but also interest in obtaining a safe, nurturing and structured home. The children . . . are well settled into their current home, which is a concurrent permanency home. The children have a strong need for a permanency disposition that would provide them with stable, structured, nurturing, drug free and violent free home that would be able to meet their educational, developmental, emotional and physical needs. The children's

8

> needs must be paramount. Based on all these factors, the Court finds that despite [mother]'s interest in preserving a parent/child relationship, the children's best interests are served by this permanency disposition herein ordered below.

Mother asserts that both she and the children prefer to preserve their parent-child relationship and argues that the district court failed to make findings about the competing interests independently from the court's findings on the statutory bases for TPR.

But mother acknowledges that both the social worker and the GAL testified that TPR serves the children's best interests. The GAL testified that the children "were doing exceptionally well in their current [out-of-home] placement, doing well in school, and it seemed to be a great fit for the kids." In her May 29, 2015 report, the GAL noted that since April 7, 2015, mother had changed her phone number "on nearly a weekly, if not every other day basis." The GAL had at least 13 phone numbers for mother on file since the beginning of the case. And from April 7 to May 29, mother's whereabouts were often unknown. The GAL reported that, without prompting by her, both children asked if they could stay in their current placement, stating that they wanted to see mother "'sometimes' but they want[ed] to stay [in their current out-of-home placement] forever." The children told the GAL about the activities they enjoyed in their current placement, seeing their older siblings daily at school, and their continued contact with their maternal grandmother and aunts and uncles. G.E.W.A. had been diagnosed with developmental delays in communication, social-emotional development, and functional skills. Both children were seeing a therapist on a weekly basis. The GAL noted that both "children [we]re in need of a permanent, stable living environment in the very near future."

Although the social worker testified that she thought that "[the children] would love to have a relationship with [mother]," she also testified that both children expressed a preference to remain in their current out-of-home placement.[2] The social worker testified that the children need a safe caretaker and "consistency for their educational needs, for their developmental needs. They need continued mental health services." She also testified that the children were receiving the care they needed in their current out-of-home placement but did not receive that care with mother. The district court also received reports from the children's service providers.

Based on our careful review of the record, we conclude that substantial evidence supports the district court's determination that TPR serves the best interests of the children and that the court did not abuse its discretion by terminating mother's parental rights to J.C.W. and G.E.W.A.

**Affirmed.**

---

[2] The record reflects the current out-of-home-placement providers' willingness to serve as a preadoption option for the children.